IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

HELEN LUCERO,

                Plaintiff,

        - vs. -                                    Civil No. 05-0459 JH/RLP

UNITED STATES OF AMERICA,

                Defendant.

**DEFENDANT'S PROPOSED FINDINGS
OF FACT AND CONCLUSIONS OF LAW**

Defendant United States of America, by its undersigned counsel, pursuant to the Court's September 11, 2006 Trial Notice, Doc. 77, and the Pretrial Deadline Schedule annexed thereto, respectfully files its Proposed Findings of Fact and Conclusions of Law. Each proposed factual finding and legal conclusion marked with an asterisk ("*") has been stipulated to by the parties in the Pretrial Order. *See* Doc. 78 at pp. 5-7. Defendant respectfully reserves the right to amend these Proposed Findings of Fact and Conclusions of Law after the Court rules on the parties' motions *in limine*. *See* Doc. 82, Plaintiff's Motion in Limine to Exclude the Cumulative Evidence of Defendant's Multiple Proffered Experts, and Doc. 84, Defendant's Motion *in Limine* to Preclude Evidence that the Prescription of Bumex was Negligent.

**A.**      **Defendant's Proposed Findings of Fact**

        1.*      Plaintiff Helen Lucero is a resident of the State of New Mexico.

        2.*      At all times material hereto, HCNNM, a non-profit corporation organized under the laws of the State of New Mexico, operated federally funded health care facilities, including a health clinic located in Las Vegas, New Mexico.

3.*	Funding to HCNNM was provided under the Public Health Service Act, 42 U.S.C. § 254b.

4.*	The claims alleged in Plaintiff's Amended Complaint arise from activity related to HCNNM's federally funded program.

5.	Plaintiff was first diagnosed with hypertension at the age of 28.

6.	At the time of the events at issue in this action, Plaintiff was 58 years old and her hypertension was being treated by personnel at HCNNM in its Las Vegas, New Mexico clinic.

7.	Plaintiff's medical chart reveals that Plaintiff has a long history of failing to comply with medical advice regarding her anti-hypertensive medications.

8.	Although Plaintiff's medical chart reflects that Plaintiff self-reported an allergy to sulfa, Plaintiff's medical history reveals no medical diagnosis of an allergy to sulfa.

9.	Plaintiff's medical chart reveals that Plaintiff was prescribed and took Maxzide and other thiazide diuretics, which are sulfa-based, for many years without any allergic and/or adverse reaction.

10.	Plaintiff's medical chart clarifies that Plaintiff's issue with Maxzide and other thiazide diuretics was hypokalemia, which is an expected side-effect of this medication which is regulated by having the patient take a potassium supplement.

11.	Plaintiff's medical chart reveals that Plaintiff failed to comply with medical advice that she take a potassium supplement while taking Maxzide and other thiazide diuretics.

12.	Plaintiff's medical chart reflects that healthcare providers at HCNNM stopped prescribing Maxzide and other thiazide diuretics for Plaintiff because she was non-compliant in taking the potassium supplement that was prescribed to her.

13.    Based on the findings in paragraphs 8 through 12 *supra*, it is apparent that Plaintiff is not allergic to sulfa.

14.    Plaintiff's medical chart reveals that Plaintiff was prescribed and took anti-hypertensive medications with a chemical composition (*i.e.*, alpha-2 agonists) similar to Clonidine for many years without any allergic and/or adverse reaction.

15.*   On October 21, 2003, Pamela Wolz, a Physician Assistant employed by HCNNM, changed the medication prescribed for Plaintiff's hypertension from Plendil to Diovan.

16.*   On November 11, 2003, Plaintiff returned to HCNNM for a follow up because she believed that Diovan was not lowering her blood pressure and was causing her to hyperventilate and feel anxious.

17.*   On November 11, 2003, Frances Gonzales, a medical assistant employed by HCNNM, noted that Plaintiff's blood pressure was 202/104.

18.*   During her visit to HCNNM on November 11, 2003, Plaintiff was examined by Imtiaz A. Malik, a Physician Assistant employed by HCNNM.

19.    During his examination of Plaintiff on November 11, 2003, Mr. Malik rechecked Plaintiff's blood pressure and noted that it was 200/104.

20.    Before initiating a treatment plan for Plaintiff on November 11, 2003, Mr. Malik reviewed pertinent portions of Plaintiff's medical chart, including the results of laboratory tests which revealed that Plaintiff's kidney function was normal (*i.e.*, she did not have renal insufficiency) in the weeks preceding November 11, 2003.

21.    To confirm that Plaintiff's kidney function was still within a normal range, Mr. Malik requested additional laboratory tests on November 11, 2003 and the results of those tests revealed that Plaintiff's kidney function was in fact normal on that date.

22. After examining Plaintiff on November 11, 2003, Mr. Malik diagnosed Plaintiff as having "undercontrolled hypertension."

23. Malik administered a 0.1 mg oral dose of Clonidine to Plaintiff at approximately 9:30 a.m. on November 11, 2003 in order to lower Plaintiff's extremely high blood pressure.

24. Clonidine is routinely administered by healthcare providers in the clinic setting to lower high blood pressure.

25. The use of Clonidine as used by Mr. Malik is one of several medically accepted methods for treating extremely high blood pressure that are specifically approved by the National Institute of Health in its Sixth and Seventh Reports of the Joint National Committee on Prevention, Detection, Evaluation and Treatment of High Blood Pressure (JNC VI and JNC VII).

26. The guidelines in the JNC VI and JNC VII are national standards of care for treating hypertension for all health care practitioners.

27. One of Clonidine's virtues is the rapid onset of action, generally within 30 minutes, and it is often used for immediate treatment of systolic blood pressure greater than 180.

28. Approximately 15 minutes after administering Clonidine to Plaintiff on November 11, 2003, Mr. Malik rechecked Plaintiff's blood pressure and noted that it had dropped to 190/84.

29. Mr. Malik did not discharge Plaintiff on November 11, 2003 until he confirmed that the Clonidine was successfully lowering her high blood pressure.

30. Because Plaintiff had no documented allergy and/or adverse reaction to anti-hypertensive medications with chemical compositions similar to Clonidine and Plaintiff's kidney function was normal on November 11, 2003, Clonidine was an appropriate anti-hypertensive medication for Plaintiff.

31.	As part of his treatment plan for Plaintiff on November 11, 2003, Mr. Malik recommended that Plaintiff discontinue taking Diovan and prescribed Plendil and Bumex.  He also recommended that she return for a follow up visit in one to two weeks.

32.	Mr. Malik discharged Plaintiff on November 11, 2003 with instructions that she restart Plendil at 10 mg. daily and begin Bumex at 0.5 mg daily on that day, and gave Plaintiff prescriptions for those two anti-hypertensive medications.

33.	Prescribing two drugs of two different classes, such as Plendil and Bumex, for treating hypertension of the magnitude that Plaintiff was experiencing on November 11, 2003 was one of several medically accepted methods for treating hypertension that are specifically approved by the JNC VI and JNC VII.

34.	Plendil, a calcium channel blocker, was appropriate because it had been tolerated well by Plaintiff in the immediate past and the choice of this medication met standard of care.

35.	Because Plaintiff had no documented allergy and/or adverse reaction to sulfa-based diuretics, Bumex, a loop diuretic, was an appropriate medication for Plaintiff and the choice of this medication met standard of care.

36.	Immediately after leaving HCNNM on November 11, 2003, Plaintiff went to her pharmacy and filled her prescriptions for Plendil and Bumex.

37.	While Plaintiff was at the pharmacy on November 11, 2003, a pharmacist instructed Plaintiff to take her medication.

38.	Notwithstanding the instructions of Mr. Malik and her pharmacist, Plaintiff did not take either the Plendil or the Bumex at any time on November 11, 2003.

39.	Although Plaintiff claims to have become increasingly uncomfortable, dizzy and lethargic after she returned home at approximately 10:30 a.m. on November 11, 2003, Plaintiff

did not contact healthcare providers at HCNNM or otherwise seek medical attention until 11:16 p.m. that night.

40.     At approximately 11:16 p.m. on November 11, 2003 – more than 13 hours after Plaintiff was administered the small oral dose of Clonidine at HCNNM – Plaintiff's son, Lonnie Lucero, took Plaintiff to the emergency room at the Northeastern Regional Hospital after she appeared to stop breathing.

41.*    Plaintiff was admitted to Northeastern Regional Hospital in Las Vegas, New Mexico on the night of November 11, 2003.

42.     Based on information available to them on the night of November 11, 2003 from Plaintiff's HCNNM medical chart and Plaintiff's family, Dr. Bradford Cambron and other healthcare providers at Northeastern Regional Hospital had the erroneous impression that Plaintiff's illness was caused by an anaphylactic reaction to Bumex.

43.     An anaphylactic reaction to medication occurs very quickly after drug administration, usually within 10-15 minutes.

44.     Plaintiff did not experience an anaphylactic and/or any other adverse reaction to Bumex on November 11, 2003 because she did not take Bumex that day.

45.     Plaintiff did not suffer an anaphylactic reaction on the night of November 11, 2003 as a result of the single, small dose of Clonidine administered to her more than 13 hours earlier by Mr. Malik on the morning of November 11, 2003.

46.     Plaintiff did not suffer an adverse drug reaction to the single, small dose of Clonidine administered to her more than 13 hours earlier by Mr. Malik on the morning of November 11, 2003.

47. During Plaintiff's admission at the Northeastern Regional Hospital in Las Vegas from November 12-17, 2003, medical providers continuously administered Clonidine to Plaintiff without any allergic and/or adverse reaction.

48.* On November 17, 2003, Plaintiff was transferred from Northeastern Regional Hospital to Presbyterian Hospital in Albuquerque for cardiac catheterization.

49. During Plaintiff's admission at the Presbyterian Hospital in Albuquerque from November 17-22, 2003, medical providers continued to administer Clonidine to Plaintiff without any allergic and/or adverse reaction.

50. After Plaintiff was discharged from Presbyterian Hospital, her physician at Cardiac Care Consultants of New Mexico prescribed Clonidine for Plaintiff, and Plaintiff took that medication for several months thereafter without any allergic and/or adverse reaction.

51. Healthcare providers at the Northeastern Regional Hospital, Presbyterian Hospital and Cardiac Care Consultants would not have prescribed Clonidine for Plaintiff if they had any reason to believe that Plaintiff's symptoms on the night of November 11, 2003 were caused by an allergic or other adverse reaction to Clonidine.

**B.     Defendant's Proposed Conclusions of Law**

1. Venue is properly laid in this District.

2. The United States District Court for the District of New Mexico has subject matter jurisdiction over Plaintiff's Amended Complaint for Damages for Personal Injuries Resulting from Medical Negligence, Doc. 66.

3. The substantive law governing this case is the FTCA, 28 U.S.C. §§ 1346(b), 2671, *et seq.*, and the applicable law of the State of New Mexico, including the Medical Malpractice Act § 41-5-1 *et seq.*, NMSA 1978.

4.	In accordance with 28 U.S.C. § 1346(b) of the FTCA, the United States' liability is to be determined by the application of the law of the place where the act or omission occurred.

5.*	Under the Public Health Service Act, as amended by the Federally Supported Health Centers Assistance Act of 1995, 42 U.S.C. §§201 *et seq.*, HCNNM and its employees may be deemed employees of the United States Public Health Service for purposes of the Federal Tort Claims Act.

6.	In their examination and treatment of Plaintiff, Mr. Malik and other healthcare providers employed by HCNNM were acting within the scope of their activities deemed to be activities of the United States Public Health Service.

7.	In treating Plaintiff on November 11, 2003, Mr. Malik and other healthcare providers employed by HCNNM were under the duty to possess and apply the knowledge and to use the skill and care ordinarily used by reasonably well-qualified medical personnel practicing under similar circumstances giving due consideration to the locality involved.  UJI 13-1101.

8.	Mr. Malik's care and treatment of Plaintiff on November 11, 2003 met the standard of care.

9.	There was no deviation from the standard of care by Mr. Malik or any other healthcare provider employed by HCNNM when Plaintiff was seen and treated at HCNNM on November 11, 2003.

10.	Where there is more than one medically accepted method of treatment for a medical condition, it is not negligent for a healthcare provider to select any of the accepted methods.  UJI 13-1111.

11. Mr. Malik's decision to lower Plaintiff's extremely high blood pressure by administering a single, small dose of Clonidine on November 11, 2003 was one of several medically accepted methods for treating Plaintiff's medical condition, and Mr. Malik did not act negligently in selecting this method.

12. Mr. Malik's decision to prescribe Plendil and Bumex for managing Plaintiff's chronic hypertension was one of several medically accepted methods for treating Plaintiff's medical condition, and Mr. Malik did not act negligently in selecting this method.

13. Neither Mr. Malik nor any other healthcare provider employed by HCNNM was negligent when Plaintiff was seen and treated at HCNNM on November 11, 2003.

14. The elements required to establish negligence in a medical negligence action are duty, breach, causation and harm. *Alberts v. Schultz*, 975 P.2d 1279 (N.M.1999). The standard for proving causation in New Mexico is proof to a reasonable degree of medical probability. *Madrid v. Lincoln County Med. Ctr.*, 923. P.2d 1154 (N.M. 1996).

15. Plaintiff bears the burden of proving each of these elements by a preponderance of the evidence, *i.e.*, the greater weight of the evidence.   UJI 13-304.

16. Plaintiff has failed to prove that Mr. Malik or any other healthcare provider employed by HCNNM breached any duty of care owed to her.

17. Even if *arguendo* Plaintiff did prove that Mr. Malik or any other healthcare provider employed by HCNNM breached a duty of care owed to her, Plaintiff bears the burden of proving by a reasonable degree of medical probability that the negligence of Mr. Malik or any other healthcare provider employed by HCNNM proximately caused her injuries.  UJI 13-302B.

18. A proximate cause of injury is that which in a natural and continuous sequence unbroken by an independent intervening cause produces the injury, and without which the injury would not have occurred. UJI 13-305.

19. Plaintiff has failed to prove by a reasonable degree of medical probability that the negligence of Mr. Malik or any other healthcare provider proximately caused her injuries.

20. Plaintiff has failed to show that the Bumex prescribed for Plaintiff by Mr. Malik on November 11, 2003 proximately caused her injuries.

21. Plaintiff has failed to show that the single, small dose of Clonidine administered to her by Mr. Malik on the morning of November 11, 2003 proximately caused her injuries.

22. Every patient has a duty to exercise ordinary care for the patient's own health and safety. A patient who fails to do so is negligent. UJI 13-1110. *See also* UJI 13-1604 ("Every person also has a duty to exercise ordinary care for the person's own safety").

23. Plaintiff breached her duty to exercise ordinary care for her own health and safety when she failed to follow the medical advice of Mr. Malik and her pharmacist that she take the medication prescribed for her by Mr. Malik. In failing to do so, Plaintiff was negligent.

24. Plaintiff's injuries and damages were caused by her own failure to follow the medical advice she received on November 11, 2003; by her own chronic failure to comply with medical advice for more than two-decades; and as a result of medical complications due to Plaintiff's ongoing cardiac disease process.

25. Healthcare providers employed by HCNNM do not guarantee a good medical result. An unintended incident of treatment is not, in itself, evidence of wrongdoing by medical personnel. Instead, a patient must prove that the unintended incident of treatment was caused by the provider's negligence. UJI 13-1112.

26. Plaintiff has not proven that her injuries were an unintended incident of the treatment she received at HCNNM on November 11, 2003.

27. Even if *arguendo* Plaintiff did prove that her injuries were an unintended incident of the treatment she received at HCNNM on November 11, 2003, Plaintiff has not proven that the unintended incident of treatment was caused by the negligence of Mr. Malik or any other healthcare provider employed by HCNNM.

28. HCNNM's hiring, training and supervision of its employees and medical staff was neither negligent nor a direct and proximate cause of the injuries to Plaintiff.

29. Plaintiff is not entitled to recover any damages from Defendant in this case.

30. Defendant is entitled to judgment in this action.

                        Respectfully submitted,

                        DAVID C. IGLESIAS
                        United States Attorney
                        District of New Mexico
                        P.O. Box 607
                        Albuquerque, NM 87103

                        Electronically Filed on 10/03/06
                        ELIZABETH M. MARTINEZ
                        Assistant United States Attorney
                        (505) 224-1469

                        DORI E. RICHARDS
                        Special Assistant United States Attorney
                        (505) 224-1402

I HEREBY CERTIFY that a copy of the foregoing pleading was mailed on October 3, 2006 to Plaintiff's counsel of record: Robert R. Rothstein, Rothstein, Donatelli, Hughes, Dahlstrom, Schoenburg & Bienvenu, LLP, P.O. Box 8180, Santa Fe, NM 87504-8180.

                        Electronically Filed on 10/03/06
                        ELIZABETH M. MARTINEZ
                        Assistant United States Attorney